**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| CONTESSICA MCKINNEY, | |
| Plaintiff, | **Case No.:** 6:24-cv-732-DCC |
| v. | **JURY TRIAL DEMANDED** |
| TRANS UNION LLC, EQUIFAX INFORMATION SERVICES, LLC, AND RECEIVABLE SOLUTIONS, LLC. | |
| Defendants. | |

## COMPLAINT

Contessica Mckinney ("Plaintiff" or "Ms. Mckinney"), by and through the undersigned counsel, brings this action on an individual basis, against Equifax Information Services, LLC ("Equifax"); Trans Union, LLC ("Trans Union") (collectively, the "Credit Bureau Defendants"); and Receivable Solutions, LLC ("Receivable"); (all defendants collectively, "Defendants"), and states as follows:

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service, or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-

1

making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible

accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7.      The preservation of one's good name and reputation is also at the heart of the

FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec.

36570 (1970)] (emphasis added).

8.      The FCRA also requires CRAs to conduct a reasonable reinvestigation to

determine whether information disputed by consumers is inaccurate and record the current

status of the disputed information, or delete the disputed information, before the end of the

30-day period beginning on the date on which the CRA receives the notice of dispute from

the consumer. This mandate exists to ensure that consumer disputes are handled in a timely

manner and that inaccurate information contained within a consumer's credit report is

corrected and/or deleted so as to not prevent said consumer from benefiting from his or her

credit and obtaining new credit.

9.    In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

10.    The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.    Plaintiff's claims arise out of the Credit Bureau Defendants' blatantly inaccurate credit reporting, wherein the Credit Bureau Defendants reported on Plaintiff's consumer reports that Plaintiff had an unpaid collections account with Receivable Solutions, LLC associated with Plaintiff's Lexington County Health Services medical account, for the amount of $4,255.00.

12.    Accordingly, Plaintiff brings claims against the Credit Bureau Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

13.    Plaintiff also brings a claim against Defendant Receivable Solutions, LLC for

4

failing to fully and properly reinvestigate Plaintiff's disputes and review all relevant information provided by Plaintiff and the Credit Bureau Defendants, in violation of the FCRA, 15 U.S.C. § 1681s-2(b)(1).

14.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs, and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## PARTIES

15.    Contessica Mckinney ("Plaintiff" or "Ms. Mckinney") is a natural person residing in Greenville, South Carolina, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

16.    Defendant Equifax Information Services, LLC. ("Defendant Equifax" or "Equifax") is a limited liability company with a principal place of business located at 1550 Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the State of Florida, including within this District. Equifax can be served through its registered agent Corporation Service Company, at 2 Sun Court, Suite 400, Peachtree Corners, GA 30092.

17.    Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

18.    Defendant Trans Union, LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 555 West Adams

Street, Chicago, IL 60661, and is authorized to do business in the State of Florida, including within this District. Trans Union can be served through its registered agent, Illinois Corporation Service Company, at 801 Adlai Stevenson Drive, Springfield, IL 62703.

19.    Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

20.    Defendant Receivable Solutions, LLC ("Receivable") is a collections company with its headquarters in Colombia, South Carolina and is authorized to do business in the State of South Carolina, including within this District. Receivable can be served through its registered agent, Paul A. Reardon, at 800 Dutch Square Boulevard Suite 100, Columbia, SC 29210.

21.    Receivable Solutions, LLC is a credit grantor and "furnisher" of consumer information, as defined in 15 U.S.C. § 1681s-2(b).

## JURISDICTION AND VENUE

22.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

23.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

24.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

25.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

26.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

27.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely

correct any inaccuracies (15 U.S.C. § 1681i).

28.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**Factual Background**

29.     The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting.  Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

30.     The Credit Bureau Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

31.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Credit Bureau Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

32.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Credit Bureau Defendants, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

33.     The Credit Bureau Defendants' consumer reports generally contain the following information:

(a)     Header/Identifying Information: this section generally includes the

consumer's name, current and prior addresses, date of birth, and phone numbers;

(b)    Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status;

(c)    Public Record Information: this section typically includes public record information, such as bankruptcy filings; and,

(d)    Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

34.    The Credit Bureau Defendants obtain consumer information from various sources.  Some consumer information is sent directly to the CRA by furnishers.

35.    The majority of institutions that offer financial services (e.g., banks, creditors, and lenders) rely upon consumer reports from CRAs (like the Credit Bureau Defendants) to make lending decisions.

36.    Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the Credit Bureau Defendants'

consumer reports.

37.     The information the Credit Bureau Defendants include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

38.     FICO Scores are calculated using information contained in the Credit Bureau Defendants' consumer reports.

39.     The Credit Bureau Defendants know that FICO and other third-party algorithms (as well as the algorithms owned by the Credit Bureau Defendants) use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

40.     The Credit Bureau Defendants know that lenders also consider a consumer's debt-to-income ratio (DTI) before deciding to extend credit or approve financing terms.

41.     DTI compares the total amount a consumer owes to the total amount a consumer earns.

42.     The higher the amount of reported debt that a consumer has, or appears to have, or is rather *reported* to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms. Rather, if offered credit at all, consumers will be offered less credit and at higher interest rates.

43.     The Credit Bureau Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by Section 1681e(b) of the FCRA.

44.     The Credit Bureau Defendants fail to employ reasonable procedures to assure

10

the maximum possible accuracy of the information that they report about consumers, including but not limited to, account balances, account statuses, payment histories, and payment statuses.

45.    Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau Complaints against the Credit Bureau Defendants for their inaccurate credit reporting.

46.    Thus, the Credit Bureau Defendants are on continued notice of their respective inadequate reporting procedures. Specifically, the Credit Bureau Defendants are on notice that their inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

47.    The Credit Bureau Defendants have received and documented many disputes from consumers complaining that Credit Bureau Defendants reported inaccurate information about them.

**Plaintiff Enters into a Settlement Agreement with Lexington Medical Center**

48.    In or around December 2017, Plaintiff was in a car accident that was caused by another driver.

49.    Plaintiff then retained Bamberg Legal LLC to represent her. Plaintiff filed a personal injury lawsuit to obtain remuneration for her damages, including payment of her medical expenses and eventually the case settled.

50.    One of the medical providers at which Plaintiff sought treatment for her injuries resulting from the car accident was Lexington Medical Center ("Lexington").

Lexington was aware of Plaintiff's personal injury lawsuit.

51.    On or about November 2, 2018, Plaintiff's attorney at Bamberg Legal LLC was sent a letter by Lexington which offered to settle two of Plaintiff's open medical accounts (for which $5,908.00 was owed), for the amount of $4,135.60.

52.    Plaintiff accepted the offer and Plaintiff's attorney at Bamberg Legal LLC received the payment of $4,135.60 from the at-fault driver.

53.    On or about November 26, 2018, Bamberg Legal LLC, on behalf of Plaintiff, sent a letter to Lexington Medical Center representative, Ms. Baxter, thanking her for reducing the Plaintiff's debt by 30% and directing her to find the enclosed check dated November 26, 2018 and numbered 389 for the amount of $4,135.60 as payment in full, as per the settlement agreement. The letter also enclosed the November 2, 2018 settlement offer letter from Lexington with account details. The letter further directed Ms. Baxter to the self-addressed stamped envelope to return a receipt of payment back to the offices of Bamberg Legal LLC.

54.    As such, the balance on the account was paid and no further amount was owed by Plaintiff.

**Defendants First Report Collection Account Regarding the Lexington Debt**

55.    Three years later, on or about October 29, 2021, Plaintiff discovered a collection account with Receivable Solutions, LLC on her Equifax and Trans Union credit reports, through a notification Plaintiff received from third-party Credit Karma.

56.    Plaintiff was devastated, she took her credit health seriously and was

concerned about the negative impact she saw occur with her credit scores due to the new collection.

57.    The timing could not have been worse as Plaintiff was in the middle of trying to purchase a home and the collection account dropped her scores significantly.

58.    Plaintiff then reviewed the pertinent details provided in the credit reports generated by Equifax and Trans Union, and learned there was a new collection account from Receivable related to Plaintiff's debt to Lexington County Health Services ("Lexington"), which had been settled three years previous and therefore never should have been sent to collections.

59.    However, the account was being reported with an unpaid balance of $4,255.00.

60.    Upon information and belief, Defendant Receivable reported to the Credit Bureau Defendants that Plaintiff owed it a debt of $4,255.00 which originated with the original creditor Lexington.

61.    The Credit Bureau Defendants reported to Plaintiff's credit file and consumer reports that Plaintiff owed on a collections account with Receivable related to the Lexington debt, which had been settled and paid by Plaintiff's law firm and should never have been reported as a collection.

62.    Plaintiff contacted her attorney at Bamberg Legal, LLC and they confirmed to her that they had paid the bill to Lexington on November 26, 2018 (check number 389 for $4,135.60).

**Plaintiff Disputes and Files a CFPB Complaint**

63.    Plaintiff became very frustrated that Receivables and the Credit Bureau Defendants continued to report the debt which had already been paid, no matter how many times she disputed. Plaintiff was not sure what else to do.

64.    On or about November 28, 2022, Plaintiff filed a complaint against Receivable with the Consumer Financial Protection Bureau ("CFPB").

65.    In her CFPB complaint, Plaintiff stated:

"Receivable Solutions started reporting a medical debt collection to the credit bureaus at the end of 2021. I was able to get copies of the paid medical bill from my accident attorney at the time. Lexington Medical placed on lien on my settlement through Avectus and had to be paid before I received anything. The medical bill was paid in November 2018. I sent Receivable Solutions receipts of everything and they still continue to report this same bill as a collection."

66.    Following the filing of her CFPB complaint, Lexington reached out to Plaintiff and told Plaintiff she still owed a balance.

67.    Plaintiff then contacted Bamberg Legal LLC again and this time they traced the check and told Plaintiff that although they had in fact sent the check to Lexington in 2018, it appeared Lexington had never cashed it. Bamberg Legal told Plaintiff they would immediately reissue the check.

68.    Plaintiff continued trying disputes but was very discouraged.

**Plaintiff's May 2023 Dispute to the Credit Bureau Defendants Regarding the Inaccurate Credit Reporting**

69.    On or about May 2, 2023, Plaintiff disputed the Receivable Account notation by mailing certified letters to each of the Credit Bureau Defendants Equifax and Trans

14

Union.

70.    Plaintiff explained that any reporting that she still owed $4,255.00 to Defendant Receivable in relation to her Lexington account was inaccurate.

71.    Plaintiff explained that she settled the account with Lexington through her attorney, Bamberg Legal LLC and that her attorney issued a check for $4135.60 and sent it to Lexington. Plaintiff stated that she had recently learned from Bamberg Legal that it appeared the check was never cashed but had been reissued.

72.    Plaintiff also explained that she had done everything right and it was not her fault that Lexington had not cashed the 2018 check but that she had complied with the conditions of settlement.

73.    To support the contents of Plaintiff's dispute, Plaintiff attached a copy of the settlement agreement reached with Lexington and a copy of the check submitted by Bamberg Legal LLC to pay the agreed upon amount. Plaintiff also attached a March 21, 2023 email from Bamberg Legal LLC stating that they reissued the check.

74.    Plaintiff requested that Equifax and Trans Union reinvestigate the disputed information and correct the reporting.

75.    According to USPS tracking, the Credit Bureau Defendants received Plaintiff's dispute letters shortly thereafter.

**Defendant Equifax's Unreasonable Dispute Reinvestigation**

76.    Upon information and belief, Equifax sent Defendant Receivable an automated credit dispute verification ("ACDV") pursuant to Plaintiff's May 2, 2023, dispute

15

to Equifax.

77.    Upon information and belief, Defendant Equifax failed to adequately review all of the information, including the proof documentation) provided to it by Plaintiff in support of Plaintiff's dispute.

78.    Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's May 2, 2023, dispute.

79.    Thereafter, Defendant Equifax failed to correct or delete the Receivable Account appearing in Plaintiff's credit file.

80.    Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered May 2, 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Trans Union's Unreasonable Dispute Reinvestigation**

81.    Upon information and belief, Trans Union sent Defendant Receivable an automated credit dispute verification ("ACDV") pursuant to Plaintiff's May 2, 2023, dispute to Trans Union.

82.    Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

83.    Upon information and belief, Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's May 2, 2023, dispute.

84.    Thereafter, Defendant Trans Union failed to correct or delete the Receivable

Account notation appearing in Plaintiff's credit file.

85.    Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered May 2, 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**The Credit Bureau Defendants' Method for Considering Consumer Credit Report Disputes**

86.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

87.    The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

88.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

89.    It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

90.    Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear

on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

91.    Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

92.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

93.    These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

94.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

95.    The data furnishers, like Defendant Receivable, then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

96.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Defendant Receivable's Unreasonable Dispute Reinvestigation**

97.     Upon information and belief, on or about May 5, 2023, Defendant Receivable received Defendant Equifax's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

98.     Upon information and belief, Defendant Receivable failed to review all relevant information provided by Defendant Equifax regarding Plaintiff's dispute tendered in or about May 2, 2023.

99.     Upon information and belief, Defendant Receivable failed to review its own internal records showing it had received the check from Plaintiff's law firm in 2018 and failed to cash it and then had received the reissued check.

100.    Defendant Receivable verified the disputed information as accurate to Defendant Equifax on or about May 5, 2023.

101.    Upon information and belief, in or about May 5, 2023, Defendant Receivable received Defendant Trans Union's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

102.    Upon information and belief, Defendant Receivable failed to review all relevant information provided by Defendant Trans Union regarding Plaintiff's dispute tendered in or about May 2, 2023.

103.    Upon information and belief, Defendant Receivable failed to review its own internal records showing it had received the check from Plaintiff's law firm in 2018 and failed to cash it and then had received the reissued check.

104.   Upon information and belief, on or about May 5, 2023, Defendant Receivable verified the disputed information as accurate to Defendant Trans Union.

105.   Defendant Receivable violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete, or unverifiable.

**Plaintiff's August 2023 Dispute to Defendant Equifax Regarding the Inaccurate Credit Reporting**

106.   Plaintiff did not receive any response from Defendant Equifax after submitting her May 2023 dispute regarding the inaccuracies about the Receivable account.

107.   As of July 5, 2023, Defendant Equifax was reporting that Plaintiff still owed Receivable $4,255.00 in relation to the Lexington account, despite multiple disputes submitted which evidenced an executed and completed settlement agreement, proving that nothing was owed by her on that account.

108.   On or about August 9, 2023, extremely upset and embarrassed by Equifax's continued inaccurate reporting, Plaintiff again disputed the Receivable Account with Defendant Equifax.

109.   Plaintiff again provided details about why the account was inaccurate and attached the proof documents showing the settlement agreement and the check that was issued.

110.   Plaintiff requested that Equifax reinvestigate the disputed information, correct the reporting, and send her a corrected copy of her credit report.

20

**Defendant Equifax's Unreasonable Reinvestigation**

111.   Upon information and belief, Defendant Equifax sent Defendant Receivable an automated credit dispute verification ("ACDV") pursuant to Plaintiff's August 9, 2023, dispute to Defendant Equifax.

112.   Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

113.   Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's August 9, 2023, dispute.

114.   Thereafter, Defendant Equifax failed to correct or delete the Receivable Account notation appearing in Plaintiff's credit file.

115.   Specifically, by October 18, 2023, based on Plaintiff's Equifax credit report, Equifax had still failed to make any corrections to the inaccurate Receivable Account notation.

116.   As such, Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered August 9, 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

117.   Plaintiff discovered that on or about October 31, 2023, Equifax removed the inaccurate Receivable Account notation.

118.   Upon information and belief, the correction of the reporting of the Receivable Account notation was unrelated to any Equifax dispute investigations.

21

**Plaintiff's September 2023 Dispute to  Defendant Trans Union Regarding the Inaccurate Credit Reporting**

119.    Plaintiff did not receive any response from Defendant Trans Union after submitting her dispute in May 2023 regarding the inaccuracies of the Receivable associated.

120.    As of June 21, 2023, Defendant Trans Union was still reporting that Plaintiff owed Receivable $4,255.00 in relation to the Lexington account, despite multiple disputes submitted which evidenced an executed and completed settlement agreement, proving that nothing was owed by her on that account.

121.    On or about September 5, 2023, extremely upset and embarrassed by Trans Union's continued inaccurate reporting, Plaintiff again disputed the Receivable Account with Defendant Trans Union.

122.    Plaintiff again provided details about why the account was inaccurate and attached the proof documents showing the settlement agreement and the check that was issued.

123.    Plaintiff requested that Trans Union reinvestigate the disputed information, correct the reporting, and to send her a corrected copy of her credit report.

**Defendant Trans Union's Unreasonable Reinvestigation**

124.    Upon information and belief, Defendant Trans Union sent Defendant Receivable an automated credit dispute verification ("ACDV") pursuant to Plaintiff's September 5, 2023 dispute to Defendant Trans Union.

125.    Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

126.   Upon information and belief, Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's September 5, 2023, dispute.

127.   Thereafter, Defendant Trans Union failed to correct or delete the inaccurate Receivable Account notation appearing in Plaintiff's credit file.

128.   Specifically, by October 31, 2023, based on Plaintiff's Trans Union credit report, Trans Union had failed to make any corrections to the inaccurate Receivable's Account notation.

129.   As such, Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered September 5, 2023, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

130.   Between the dates of October 31, 2023, and November 10, 2023, Trans Union removed the inaccurate Receivable Account notation.

131.   Upon information and belief, the correction of the reporting of the Receivable Account notation was unrelated to any Trans Union dispute investigations.

**Defendant Receivable's Unreasonable Dispute Reinvestigation**

132.   Upon information and belief, in or about August 12, 2023, Defendant Receivable received Defendant Equifax's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

133.   Upon information and belief, Defendant Receivable failed to review all relevant information provided by Defendant Equifax regarding Plaintiff's dispute tendered

in or about August 9, 2023.

134.    Upon information and belief, Defendant Receivable failed to review its own internal records showing it had received the check from Plaintiff's law firm in 2018 and failed to cash it and then had received the reissued check.

135.    On or about August 12, 2023, Defendant Receivable verified the disputed information as accurate to Defendant Equifax.

136.    Upon information and belief, on or about September 8, 2023, Defendant Receivable received Defendant Trans Union's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

137.    Upon information and belief, Defendant Receivable failed to review all relevant information provided by Defendant Trans Union regarding Plaintiff's dispute tendered in or about September 5, 2023.

138.    Upon information and belief, Defendant Receivable failed to review its own internal records showing it had received the check from Plaintiff's law firm in 2018 and failed to cash it and then had received the reissued check.

139.    On or about September 8, 2023, Defendant Receivable verified the disputed information as accurate to Defendant Trans Union.

140.    Defendant Receivable violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete, or unverifiable.

**Plaintiff's Damages**

141.    The Credit Bureau Defendants published to third parties that Plaintiff owed $4,255.00 to Defendant Receivable, despite Plaintiff's continued disputes and proof documentation showing their misleading and inaccurate reporting.

142.    Specifically, Equifax published to the following creditors that Plaintiff owed $4,255.00 to Defendant Receivable as it pertained to the Lexington account, which was settled on November 26, 2018, despite Plaintiff's continued disputes thereto.

a.  Navy FCU – October 3, 2023

b.  Capital One - October 25, 2023

c.  Capital One - July 18, 2023

d.  Capital One - June 28, 2023

e.  Screening Reports Inc.- May 24, 2023

f.  Informative Search - November 20, 2021

g.  Equifax Mortgage Services – November 17, 2021

143.    Specifically, Trans Union published to the following creditors that Plaintiff owed $4,255.00 to Defendant Receivable as it pertained to the Lexington account, which was settled on November 26, 2018, despite Plaintiff's continued disputes thereto.

a.    Goldman Sachs Bank - October 12, 2023

b.    American Express - August 9, 2023

c.    Capital One - July 18, 2023

d.      Capital One - June 28, 2023

e.      Jetty National Inc. - May 25, 2023

f.      Navy FCU - April 13, 2023

g.      Liberty Mutual - February 2, 2023

h.      American Express - October 6, 2022

i.      Navy FCU - July 6, 2022

j.      Navy FCU - May 13, 2022

k.      Informative Research- November 30, 2021

l.      Resource Financial Services – November 17, 2021

m.      New American Funding – November 17, 2021

144.    Plaintiff was denied credit for which she applied from the following creditors due to the inaccurate Receivable collection reported to her Trans Union and Equifax reports.

a.      Informative Research

b.      Resource Financial Services

c.      New American Funding

d.      Navy Federal

e.      American Express

f.      Goldman Sachs Bank

145.    Open collection accounts with balances are especially harmful to a consumer's FICO and other credit scores and can often drop a consumer's scores by around

30-70 points.

146.    Defendants' false reporting of an additional $4,255.00 of debt which Plaintiff did not actually owe negatively increased her Debt-to-Income ratio as viewed by potential creditors.

147.    As a result of the inaccurate Receivable Account which had been paid and settled, and despite Plaintiff's numerous disputes over two years, Defendants made it practically impossible for Plaintiff to obtain credit.

148.    Plaintiff, through her attorneys, fulfilled all her obligations of the settlement with Lexington. Before Plaintiff's attorneys reissued the check to Lexington in or around March 2023, Defendant's reporting of the Receivable collection was materially misleading because Plaintiff sent Defendants proof that her attorneys had issued payment on her behalf to Lexington, and she no longer owed any debt.

149.    After Plaintiff's attorneys reissued the check to Lexington, Defendants' continued reporting of the Receivable collection was patently inaccurate.

150.    At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

151.    At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

152. As a standard practice, the Credit Bureau Defendants do not conduct independent investigations in response to consumer disputes. Instead, they merely parrot the response of the credit furnisher despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

153. The Credit Bureau Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs. Accordingly, the Credit Bureau Defendants' violations of the FCRA are willful.

154. As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**
**(First Claim for Relief Against Defendants Equifax and Trans Union)**

155.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

156.   The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

157.   On numerous occasions, Defendants Equifax and Trans Union prepared patently false consumer reports concerning Plaintiff.

158.   Defendants Equifax and Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

159.   Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

160.   Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish

or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

161.   As a result of Defendants' Equifax and Trans Union conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

162.   Defendants Equifax and Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

163.   Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**
**(Second Claim for Relief Against Defendants Equifax and Trans Union)**

164.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

165.   The FCRA mandates that a CRA conducts an investigation of the accuracy of

information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1). The Act imposed a 30-day time limit for the completion of such an investigation. *Id*.

166.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file.  *See* 15 U.S.C. § 1681i(a)(5)(A).

167.    On at least one occasion during the past two years, Plaintiff disputed the inaccurate information with Equifax and Trans Union and requested that they correct and/or delete a specific item in her credit file that is patently inaccurate, materially misleading, and highly damaging to her, namely, the $4,255.00 open Receivable collection.

168.    In response to Plaintiff's dispute, Equifax failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

169.    In response to Plaintiff's dispute, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

170.    The Credit Bureau Defendants violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they

received the notices of dispute from Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

171.    As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

172.    The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

173.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT III
### 15 U.S.C. § 1681s-2(b)
**Failure to Conduct an Investigation of the Disputed Information and Review all Relevant Information Provided by the Consumer (Only Claim for Relief Against Defendant Receivable)**

174.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

175.    Defendant Receivable furnished the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax and Trans Union.

176.    Defendant Receivable violated 15 U.S.C. § 1681s-2(b) by failing to investigate Plaintiff's dispute, or otherwise by failing to fully and properly investigate Plaintiff's dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax and Trans Union.

177.    As a result of Defendant Receivable's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

178.    Defendant Receivable's conduct, action, and inaction were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

179.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant Receivable in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.    Determining that Defendants negligently and/or willfully violated the FCRA;

ii.    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.


RESPECTFULLY SUBMITTED this February 12, 2024


*/s/ Dawn McCraw*
Dawn McCraw (SCB #105059)
Consumer Attorneys
8245 N 85th Way
Scottsdale, AZ 85258
T: (602) 807-1527
F: (718) 715-1750
E: dmccraw@consumerattorneys.com

*Attorneys for Plaintiff*
*Contessica McKinney*

34